Carroll,     ⎫
April 2, 1912. ⎭

### STATE & a. v. GREAT FALLS MANUFACTURING CO.

In the absence of a legislative grant, the state's title in great ponds extends to high-water mark.

An owner of land at the outlet of a great pond has no right, as an incident of his littoral proprietorship, to so manage his dam as to lower the water below its natural level.

A littoral proprietor who has constructed a dam at the outlet of a great pond has the right to a reasonable use of the pond as a reservoir; and the reasonableness of the use is a question of fact, to be determined in view of all the circumstances of the particular case.

BILL IN EQUITY. The defendants' demurrer was overruled, and they excepted. Transferred from the May term, 1911, of the superior court by *Chamberlin*, J.

*William H. Sawyer*, for the plaintiffs.

*Choate, Hall & Stewart* (of Massachusetts) and *Kivel & Hughes*, for the defendants.

WALKER, J. The state, in behalf of the public, seeks to have the defendant enjoined in its use of the outflow of Lovell pond in Wakefield, "so that it may not draw, divert, or use the same in any such manner whatsoever as to lower the surface thereof below the natural level of said pond at any and all the respective seasons of the year." Lovell pond is a "great pond," and it is alleged that the title to the pond and the soil under it is vested in the state for the benefit of the public. The defendant is a manufacturing corporation and obtains its power in part from Lovell pond. It is also alleged in the bill that it wrongfully diverts the water of the pond so "as to greatly lower the same below the natural and usual level thereof, at all the respective seasons of the year," and as a consequence "a large strip of land has been left uncovered by the waters thereof, between the natural shore line of said pond and the line of said pond as thus lowered, whereby the public rights of fishing, boating, and bathing in said pond, and the rights of the riparian owners to the convenient and unlimited access to the waters of said pond from the shores thereof, have been greatly impaired," and that the defendant intends to continue to so lower the waters of the

pond "regardless of the rights of the public." The defendant demurred to the bill upon the grounds (1) that it is not alleged that the defendant has lowered the pond below the natural level at low water, and (2) that the state has no title in the waters of said pond or in the shore above the line of natural low water. The court overruled the demurrer, and the defendant excepted.

The defendant's contention, as stated in the demurrer, is that it has the legal right to lower "the waters of said pond below the natural and usual high-water level thereof at all seasons of the year," and thus to cause "a strip of land to be left uncovered by the waters of said pond between the natural high-water shore line and the natural low-water shore line." The plaintiffs claim that the defendant, as a littoral proprietor at the outlet of the pond, has no such right, and that its acts under such assumed right should be restrained.

So far as the defendant's contention is based upon the state's want of title to the land between the lines of high and low water, it cannot be sustained. In the absence of a legislative grant, the state's title in great ponds in this state extends to the high-water line.

The case of *State* v. *Sunapee Dam Co.,* 70 N. H. 458, is a strong authority for the proposition that the title of the state in the great ponds extends to high-water mark. The defendant was incorporated in 1820, and was empowered "to sink the outlet of said lake at the source of said Sugar river to the depth of ten feet below the low-water mark of said lake, and to erect and maintain a dam there with suitable gates and flumes to the height of said low-water mark." This evidently authorized the Dam Company to draw the water down to that mark. It was understood that it did not have that authority as an incident of its rights as a littoral proprietor; hence it sought and obtained a special legislative grant for that purpose. But if the state's title only extended to low-water mark, the grant did not operate to confer upon it any additional rights. If the defendant's contention is sound that it owns the bed of the lake between high and low-water mark, the proprietors of the Dam Company could have done without legislative authority what the defendant in this case claims the right to do by virtue of its ownership of the land at the outlet of the pond. The fact that such special legislation was deemed necessary ninety years ago is evidence of much weight upon the question of the location of the boundary line between the state and the landowners bordering on a great

pond. It has a tendency to show that there was a general under-
standing that the boundary was the line of high-water mark; and
that when it was said that the title of the littoral owners extended
to the "water's edge" (*State* v. *Gilmanton,* 9 N. H. 461; *Concord
Mfg. Co.* v. *Robertson,* 66 N. H. 1, 4), the idea intended was that
it was limited by the high-water mark.

In *State* v. *Sunapee Dam Co., supra,* this interpretation was
adopted. It was there held that a charter conferring the right
to control within definite limits the outflow from a body of water
held by the state in trust for public use is a legitimate exercise of
legislative power; and a lowering of the water level to the point
authorized by such charter (the low-water mark), if done in a reason-
able manner, does not constitute an infringement of public or private
rights which can be restrained by equity. In the opinion (*p.* 461)
it is said: "And certainly the littoral proprietors, as such, can have no
better ground of complaint" than the public have, "because, as
is well understood, in public waters there is no private ownership
in the soil below ordinary high-water mark. The primary ground
of their grievance, and the one from which all the others follow, is
the uncovering of a portion of the land underlying the water between
the high and low-water mark. 'But,' as is said by the defendants'
counsel, 'the state, and not these individual plaintiffs, is the owner
of the lake and of the soil to high-water mark, and had a right to
confer its use and enjoyment upon its grantee.'"

In *Dolbeer* v. *Company,* 72 N. H. 562, 564, it was determined that
"the pond in the plaintiff's land is public water, and his absolute
ownership in the land ceases at the water's edge, or at high-water
mark. . . . The bed of the pond inside of this line belongs
to the public; but the plaintiff, as owner of the adjoining land, has
certain rights in it and in the water." This recent judicial definition
of the meaning of "water's edge," when used as a boundary of land
adjacent to a great pond or lake, cannot be disregarded or over-
ruled, in the absence of any convincing reason that it is wrong, or
that the court in the Sunapee dam case was misled in deciding that
private ownership was bounded by high-water mark. Assuming
that the defendant has no greater rights in Lovell pond than those
ordinarily possessed by littoral proprietors, it is clear that its abso-
lute ownership of the basin of the pond opposite its land is bounded
by the line ordinarily made by the water when the pond in its natural
condition is full. It cannot justify drawing the water down to
low-water mark as against the public, upon the ground that it is

merely exercising its proprietary rights as a littoral landowner. Whatever rights it has below high-water mark are qualified rights, even in that portion of the shore opposite its own land. It cannot remove or draw off from the land the water between the high and the low-water lines, under a claim of ownership of the adjoining shore land thereby exposed.

But while its legal title in the land is thus limited, it is still entitled to the use of the water of the lake in a reasonable manner; and it is probable that the contention in this suit will be best settled by the application of that doctrine, which has often been announced in this state. The most recent decision by this court upon the question thus presented is *Dolbeer* v. *Company, supra,* where it is said (*p.* 565): "As owner of the adjoining land, the plaintiff had the right to build wharves and other structures into the pond for his own use, to an extent that would not unreasonably interfere with the rights of the public in the pond. As an incident of the ownership of the land on which a dam can be built which will control the flow of water from the pond, he has the right to a reasonable use of the pond for a reservoir." The defendant, therefore, upon the allegations of the bill, has "the right to a reasonable use of the pond for a reservoir," and that would seem to be the extent of its rights. As the question of reasonable use in such cases is principally a question of fact, it cannot be held that the defendant's act in drawing the water of the pond below the natural level at all seasons of the year is unreasonable, or is in excess of its right. It may seriously interfere with the rights of public boating, fishing, and bathing, or may result in a great public nuisance; on the other hand, it may occasion the public little or no inconvenience or annoyance. Its effect in these respects must be determined as a fact under all the circumstances from competent evidence, before the court will interpose to restrain the defendant's management of its dam. The question is not so much one of title to the pond, as one of the reasonable management and usufruct of the water in its egress from the dam at the outlet of the pond. The allegation of the bill, that the defendant intends to continue to lower the pond "regardless of the rights of the public," is a sufficient allegation that it does not manage its dam in a reasonable manner in view of the public rights. The demurrer was properly overruled.

*Exception overruled.*

All concurred.